[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
This is an action brought by plaintiff John Griffin against CT Page 5426 defendant Walter Kupchunos, the High Sheriff for Hartford County. The plaintiff claims that Kupchunos appointed him to act as his chief deputy, but that said defendant then wrongfully removed him from that position. The plaintiff has filed a six-count amended complaint dated February 5, 1997 alleging breach of an employment contract, breach of the implied covenant of good faith and fair dealing, wrongful termination, a violation of his constitutional right to free speech, and a violation of Conn. Gen. Stat. § 31-51q. Counts 1, 2 and 3 have been stricken on the ground that sovereign immunity bars the recovery sought in these counts. (See Memorandum of Decision Re: Defendant's Motion to Strike dated November 26, 1997, Teller, J.) Defendant now seeks summary judgment on Counts 4, 5 and 6.
Count 4 of the complaint alleges a violation of free speech — 42 U.S.C. (§ 1983). Count 5 alleges a violation of General Statutes § 31-51q. Count 6 alleges wrongful termination. Defendant claims he is entitled to summary judgment because (a) he is entitled to sovereign immunity; (b) he is entitled to qualified immunity; (c) the plaintiff did not hold a constitutionally or statutorily protected interest in his former position of employment; and (d) he has failed to establish a claim for wrongful termination.
The plaintiff opposes the motion for summary judgment for the following reasons:
(1) the court has previously found the sovereign immunity doctrine inapplicable;
(2) the high sheriff's actions were in excess of his statutory authority;
(3) the "at will" appointment of Mr. Griffin does not allow termination for reasons violative of public policy;
(4) Mr. Kupchunos violated Section 31-51q of the Connecticut General Statutes.
The issue of sovereign immunity has already been addressed by Judge Teller in his memorandum of decision. (See above). As stated therein, sovereign immunity does not bar suits against state officials acting in violation of constitutional rights.Savage v. Aronson, 214 Conn. 256, 264 (1990); Antinerella v.Rioux, 229 Conn. 479, 493 (1994). CT Page 5427
Although Judge Teller only addressed Counts 4 and 6 on this issue, there is no sovereign immunity under Count 5 either. General Statutes § 31-51q specifically provides for punitive damages for a violation of that statute by "(A)ny employer, including the state and any instrumentality or political subdivision thereof." Thus, sovereign immunity does not apply to Counts 4, 5 and 6.
In regard to the claims set forth in Counts 4, 5 and 6 the court notes that the parties have each filed an affidavit as follows:
 AFFIDAVIT OF HIGH SHERIFF WALTER KUPCHUNOS
"I, High Sheriff Walter Kupchunos, being duly sworn, do hereby depose and say that:"
"1. I am over the age of eighteen and understand the obligations of an oath.
"2. Since June 1995, I have been the High Sheriff of Hartford County. It is in this capacity that I am familiar with the facts stated herein.
"3. In November 1994, I was elected to serve as the High Sheriff of Hartford County for a term of four years beginning on June 1, 1995. Prior to 1994 the election, I agreed to appoint John Griffin to the position of Chief Deputy Sheriff in return for his support in the election. At the time we made this agreement, Mr. Griffin and I were political opponents, each seeking the democratic nomination for High Sheriff.
"4. Pursuant to Article Fourth, § 25 of the Connecticut Constitution, each county elects a sheriff for a four year term running from June 1st of the year following the election. Upon assuming office, the High Sheriff of Hartford County is authorized to appoint special deputy sheriffs (who provide courthouse security, staff prisoner lock-ups and conduct prisoner transport) pursuant to Conn. Gen. Stat. § 6-43 and deputy sheriffs (who serve civil process) pursuant to Conn. Gen. Stat. §6-37.
"5. From among the deputy sheriffs in each county, each High Sheriff is authorized to appoint a "chief deputy sheriff" who, pursuant to Conn. Gen. Stat. § 6-37 "shall, in the absence, illness or disability of the sheriff or by his discretion CT Page 5428 exercise all the powers and perform all the duties of the sheriff prescribed by statute; and, in the event of the death, resignation or removal of the sheriff, shall exercise such powers and perform such duties until the vacancy in the office of sheriff has been filled."
"6. After my election to High Sheriff, between November 1994 and June 1, 1995, I assigned Mr. Griffin several tasks to be completed prior to our taking office. Specifically, I instructed Mr. Griffin to prepare a code of conduct to govern the employees of the Hartford County Sheriff's Office. In addition, given Mr. Griffin's alleged experience in law enforcement and the handling of explosives, I instructed him to develop policies and procedures for responding to emergencies within the courthouses that we patrol. Mr. Griffin did not complete either of these tasks.
"7. Despite my concerns about his trustworthiness and his ability to serve as a high-ranking policy maker, upon taking office on June 1, 1995, I appointed Mr. Griffin as a deputy sheriff and as my chief deputy sheriff. As my chief deputy, Mr. Griffin was authorized to act in my stead during absences and was my "second-in-command." He occupied an office next to mine and was responsible for supervising payroll for most special deputies, overseeing office training, meeting with representatives of other state agencies to further inter-agency cooperation, participating in hiring decisions, monitoring security in courthouses and lock-up facilities and drafting policies and procedures relating to agency operations. In addition, Mr. Griffin had unlimited access to the records of this Office, including confidential personnel files. In short, his job each day was to assure that all of the courthouses and lockup facilities in Hartford County ran smoothly and safely. As the chief deputy, Mr. Griffin was the second-highest ranking person in the Office and answered only to myself.
"8. Both before and after I appointed Mr. Griffin to serve as my chief deputy I had serious concerns about his trustworthiness and his ability to perform the duties of that position. I consulted throughout this period with Assistant Attorney General Michael J. Lanoue regarding the removal and termination of a chief deputy, and I relied upon his advice throughout the termination process.
"9. I terminated Mr. Griffin as my chief deputy because I believe he was unable to perform the functions of a chief deputy CT Page 5429 sheriff and because his behavior caused me to lose confidence in his ability or desire to accomplish the beneficial goals of my office. In short, his presence was divisive and there was literally nothing positive about our working together as the two highest ranking policy makers of the Office of the Hartford County Sheriff. There simply was no semblance of a "working relationship" between Mr. Griffin and myself, and the lack of such a relationship between the two highest ranking officials in the office led to confusion and disagreements among subordinate employees, all to the detriment of the Office.
"10. After his removal as chief deputy, Mr. Griffin continued to serve as a deputy sheriff until his term expired on May 31, 1999. During that time, he became a candidate for the Office of Hartford County High Sheriff and an outspoken critic of my personal and professional endeavors, including my office policies, hiring practices and financial dealings.
"11. After I was elected to a new term as high sheriff in November 1998, I did not appoint Mr. Griffin to a new term as a deputy sheriff."
 AFFIDAVIT OF JOHN R. GRIFFIN
"I, John R. Griffin, being duly sworn, do hereby depose and say that:
"1. I am over the age of eighteen and understand the obligations of an oath.
"2. I am the plaintiff in the above entitled action.
"3. In June 1995, I was appointed chief deputy sheriff by the defendant pursuant to C.G.S. 6-37.
"4. While my statutory duties as chief deputy sheriff were merely to serve as high sheriff in the illness, absence or death of the high sheriff, Mr. Kupchunos also requested that I perform other duties for him in the department.
"5. During my term as chief deputy sheriff, I uncovered problems of illegality and unethical conduct in the Hartford County Sheriff's Department by Mr. Kupchunos or his agents. These illegal and/or unethical problems included:
 a. Kupchunos directing process to deputy sheriffs who CT Page 5430 used Kupchunos wife as secretary, therefore giving Kupchunos unethical financial benefits;
 b. Seeking a correction of Kupchunos illegal practice of charging battered wives $40.00 cash advance payment for services of restraining orders;
 c. Seeking a correction of Kupchunos practice of charging illegal fees to out-of-state litigants in the amount of an $80 service charge;
 d. Seeking a correction of Kupchunos practice of appointing and promoting convicted felons;
 e. Seeking a correction of the practice of certain deputy sheriff's under Kupchunos converting clients' fund accounts moneys to their own use, a matter which Kupchunos said to ignore;
 f. Seeking a correction in the possible practice of deputy sheriffs improperly handling service of restraining orders which may have led to the death of a lady and her son in Hartford, a matter which Kupchunos said to "bury";
 g. Seeking an investigation into suspected drug use by special deputy sheriffs, a matter which Kupchunos intentionally ignored under the stated rationale, "I'd be afraid of what we'd find."
 h. Seeking correction of the practice of some special deputies close to Kupchunos defrauding the state of false overtime claims, a matter which Kupchunos said to overlook.
 i. Objecting to Kupchunos practice of threatening deputy sheriffs with adverse job consequences unless they gave money for a lobbyist;
 j. Objecting to Kupchunos practice of using the official state-provided car for his private use in serving civil process and of his practice of charging mileage to the litigants in violation of statute.
"6. In each and every case of illegal and unethical conduct, I brought the matter up to Kupchunos for him to resolve. CT Page 5431 In each and every case, Kupchunos tailed to correct either his illegal or unethical behavior or that of his closest subordinates.
"7. In many of these cases, such as illegal fee activity, Kupchunos was blatantly acting far beyond the scope of his statutory authority.
"8. At all times, I properly performed the statutory duties of my position as chief deputy sheriff.
"9. At all times, I properly performed the non-statutory activities requested of me by Kupchunos during my service as chief deputy sheriff unless such activities constituted illegal or unethical conduct.
"10. At no time was my working relationship with Kupchunos impaired to a degree which impacted the efficiency of the department in serving the public.
"11. During the entire time of my serving as chief deputy sheriff both I and Mr. Kupchunos were members of the Democratic Party.
"12. On June 5, 1996, Kupchunos terminated me from my position as chief deputy sheriff due to my continuing to point out the illegal and unethical activities conducted by him and his subordinates.
"13. After filing suit to reverse this termination, this court reinstated me as chief deputy sheriff in a temporary injunction proceeding on grounds that Kupchunos failed to follow his own code of conduct for termination for "just cause" and with certain procedural rights.
"14. Thereafter, Kupchunos unilaterally changed the code of conduct to remove my just cause and due process rights and sought dissolution of said injunction.
"15. This court dissolved the injunction by decision dated October 2, 1996.
"16. Kupchunos terminated me again as chief deputy sheriff on October 8, 1996.
"17. Kupchunos repeatedly told me that I was doing a good CT Page 5432 job for the sheriffs department. In a letter dated March 29, 1996, Kupchunos wrote that I "represent the Sheriff's Department at it's best, and continued examples of this nature will reinforce the department's importance in the eyes of the public. Again, I thank you for your support."
Thus, Kupchunos claims in his affidavit that despite his concerns about Griffin's trustworthiness and his ability to serve as a high-ranking policy maker he appointed him as his chief deputy sheriff. He claims that he terminated him because he believed Griffin was unable to perform the functions of a chief deputy sheriff and because "his behavior caused him to lose confidence in his ability or desire to accomplish the beneficial goals" of his office.
Griffin's affidavit, on the other hand, states that he was fired due to his "continuing to point out the illegal and unethical activities" conducted by Kupchunos and his subordinates.
Clearly, there is a factual dispute as to why Griffin was terminated. Defendant's position, however, is that even if the statements set forth in Griffin's affidavit were true, Kupchunos was entitled to terminate him, and he claims that the removal of the plaintiff from the position of Chief Deputy Sheriff is not subject to judicial review.
The court finds that the motion for summary judgment should be denied for two reasons: First, the "at will" appointment of Mr. Griffin does not allow termination for violations of public policy. Defendant argues that this "at will" appointment can be terminated for any reason. He asserts that the statutes (§ 6-37
and § 6-45) require just cause for removal of deputy sheriffs but do not require just cause for removal of the chief deputy sheriff. While that may be so, the court finds that there are exceptions to the rule that an at will employee may be terminated for any reason. He may not be terminated where the claims, if true, involve mandates of public policy.
Where as here the plaintiff has alleged illegal and/or unethical activities on the part of the defendant, (see Griffin Affidavit Section 5, a through j), the court finds that, if true, such activities are a violation of public policy. Antinenella v.Rioux, 229 Conn. 479, 493 (1994); Sheets v. Teddy's FrostedFoods, Inc., 179 Conn. 471 (1980). Inasmuch as Griffin claims he was fired because he spoke out against these claimed illegal CT Page 5433 and/or unethical activities, the court finds that if so, Griffin's right to free speech was violated.
Second, the motion for summary judgment should be denied because the allegations contained in the plaintiff's affidavit, if true, would constitute a violation of General Statutes § 31-51q. That statute provides:
 Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorneys fees to the employer.
The plaintiff alleges that he was terminated in retaliation for exercising his rights of free speech and that at all times he properly performed the statutory duties of his position. D'Angelov. McGoldrick, 239 Conn. 356 (1996). Defendant argues that to prevail on a claim under this statute, a plaintiff must prove: (1) that he was exercising rights protected by thefirst amendment to the United States Constitution or by an equivalent provision of the Connecticut Constitution; (2) that he was fired "on account of" his exercise of such rights; and (3) that his exercise of constitutional rights did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer. Defendant claims that it is undisputed that plaintiff's exercise of his constitutional rights did in fact interfere with his bona fide job performance. He therefore claims that § 31-51q is not a bar to Griffin's termination. In this regard the court finds that a balancing test must be used. Schnabel v. Tyler, 230 Conn. 735
(1994). The balancing test as set forth in Schnabel is as follows: (1) The plaintiff at trial must establish that his speech can be fairly characterized as constituting speech on a matter of public concern and (2) The speech was at least a CT Page 5434 substantial or motivating factor in the discharge. If both of these elements are proven, then Kupchunos may avoid liability if he establishes that either: (3) he would have made the same decision in the absence of the protected conduct; or (4) the plaintiff's conduct interfered with the defendant's effective and efficient fulfillment of his responsibilities to the public.Schnabel v. Tyler supra at page 750. These are all questions of fact raised by the affidavits of the parties and cannot be determined by a motion for summary judgment.
In furtherance of its arguments the defendant has provided the court with several United States Supreme Court cases.Connick v. Meyers, 461 U.S. 138, 75 L.Ed.2d 708, 103 S.Ct. 1684
(1982); ___ v. Doyle, [MT. HEALTHY CITY BOARD OF ED. v. DOYLE],429 U.S. 274, 50 L.Ed.2d 471, 97 S.Ct. 568; Pickering v. Boardof Education 205, Will County, Illinois, 391 U.S. 563,20 L.Ed.2d 811, 88 S.Ct. 1731; Waters v. Churchill,511 U.S. 661, 128 L.Ed.2d 686, 114 S.Ct. 1878 (1994). This court does not believe any of those cases would justify the granting of the defendant's motion for summary judgment. Clearly, there are disputed facts as to whether the defendant violated public policy, violated the terms of General Statutes § 31-51q, or wrongfully terminated the plaintiff.
Accordingly, the motion for summary judgment is denied.
___________________ (Allen) Judge Trial Referee